F. A. Lange, Jr. v. Commissioner.
Lange v. Commissioner
Docket No. 12273.
United States Tax Court
1949 Tax Ct. Memo LEXIS 133; 8 T.C.M. (CCH) 648; T.C.M. (RIA) 49172; June 30, 1949
*133 James J. Waters, Esq., 906 Commerce Bldg., Kansas City, Mo., for the petitioner. William Schwerdtfeger, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By these proceedings petitioner seeks a redetermination of deficiencies in income tax for 1941, 1942, and 1943. Respondent has determined a 50 per cent fraud penalty for each of those years. Petitioner also claims an overpayment for 1941 and 1943. The amounts involved are as follows: Deficiency
50% Penalty
Overpayment
Year
Asserted
Asserted
Claimed
1941
$ 2,652.60
$ 1,326.30
$3,762.35
1942
22,500.28
11,250.14
1943
43,738.35
20,556.01
2,005.14
Totals
$68,891.23
$33,132.45
$5,767.49
The questions presented are whether respondent erred in determining that petitioner received but did not report taxable income from the Crucible Steel Casting Company in the amounts of $5,840.97, $30,958.36, and $51,538.02 for 1941, 1942, and 1943, respectively; and whether all or some part of the deficiencies in tax for the years in question was due to fraud with intent to evade tax within the meaning of Internal Revenue Code, section 293 *134 . Findings of Fact For 1941, 1942, and 1943 petitioner filed Federal income tax returns with the collector of internal revenue for the district of Wisconsin, showing net taxable income and tax due as follows: Net
Taxable
Victory Tax
Income
Net Income
Tax Due
1941
$19,632.02
$ 4,606.44
1942
42,261.43
20,516.16
1943
35,463.49
$37,626.21
14,452.88
Petitioner made out his own returns for these years. The amounts reported constituted only petitioner's salaries and bonuses from the Crucible Steel Casting Company, hereinafter referred to as Crucible. The taxes shown as due were duly paid. Crucible was organized in 1898 by petitioner's father and a partner. During the taxable years its stock was owned by various members of the Lange family, except a small amount of stock held by other individuals. During the taxable years petitioner was treasurer and one of the principal stockholders in the corporation, holding his shares either directly or through the Gulf Securities Holding Company whose outstanding stock was held as follows: Shares
Stockholder
499
Petitioner
1
Walter W. Lange
4p9
Lillian Lange (Walter's wife)
1
F. A. Lange, III (Walter's son)
*135 Crucible was in the business of making large steel castings used primarily in heavy machinery, and during the taxable years was engaged exclusively in doing work under government contracts relating to the war effort. In May, 1942, Crucible negotiated a contract with the Defense Plant Corporation for the erection of an addition to its factory. The addition was constructed by the Hunzinger Construction Company, and approximately doubled the productive capacity of Crucible. Petitioner's brother, A. C. Lange, spent most of his time in the foundry, and another brother, Walter, and petitioner, more or less, handled the administrative and purchasing end of the business. Petitioner and Walter Lange had friendly relations; differences arose between Walter and A.C., and petitioner endeavored to adjust the difficulties. Petitioner previously had left college at the age of 21 in order to get into business and to attempt to reconcile the differences between Walter and A.C. Walter, who was some years his senior, had acted as a father to him since 1921 when his mother and father were divorced. During 1941, 1942, and 1943, many personal expenses of petitioner were paid by Crucible and charged *136 by the company to various corporate expense accounts, particularly "Sundry Administrative Expense" and "General Expense, Plant." These payments were made by check of the company. During 1941 and until the summer of 1942 petitioner resided at the Ambassador Hotel in Milwaukee. Eight of his monthly hotel bills were among those paid by Crucible and charged to company expense. These checks, when made out, were attached to a voucher back which was a carbon copy of the check, plus a notation to show the corporation accounts which were being charged. Petitioner personally signed five of the eight checks to which these voucher backs were attached. During the three years 1941, 1942, and 1943, petitioner was obligated to pay a monthly sum of $43.01 to Assured Investors, Inc., on a savings plan and insurance program to insure the education of petitioner's daughter. Crucible paid these sums for petitioner. The corporation voucher backs attached to the checks used in making the payments showed in each instance that of the $43.01, $21.35 was charged to interest on notes payable, $20 to sundry administrative expense, and $1.66 to prepaid expense. Petitioner personally signed about half of these *137 checks. In the summer of 1942 petitioner purchased a home at Thiensville, Wisconsin, and completely furnished it. From that time until the end of 1943 Crucible paid many of the utility bills incurred at his home and charged such disbursements to sundry administrative expense. Again the voucher backs attached to the checks showed the account to be charged, and of nine checks so drawn seven were signed by petitioner personally. During the years here involved petitioner was an active polo player and owned a number of polo ponies and a stable for the horses. Checks were issued by Crucible to pay bills in connection with this activity, and charged to corporate expense. The voucher backs were attached to these checks showing that they were being so charged. Petitioner signed a number of such checks. Out of approximately $10,000 of decorating work done at petitioner's new home at Thiensville, $2,287 was paid for by Crucible and charged to corporate expense. Petitioner signed one of the two checks of the corporation used in making that payment. The same is true of one check of the company used to pay for repairs on petitioner's 1941 Cadillac automobile and panel truck. During 1943 *138 petitioner had extensive repairs and remodeling done at the stables where he kept his polo ponies and at the Meadowbrook Polo Club where he played polo. In that year Paul J. Grunau did plumbing and heating work at the stables in the amount of $612.43, Clarence J. Koenig did painting in the amount of $424.63, and the Hunzinger Construction Company did construction and repair work in the amount of $5,321.39. Russell Weymeier installed a flower bed and shrubs at the polo field. Crucible likewise paid for those improvements by check and charged the amounts to corporate expense. The Hunzinger Construction Company at that time was engaged as prime contractor in erecting the Defense Plant Corporation factory adjoining Crucible, and Paul J. Grunau was also engaged in plumbing and heating work at the plant. In the course of their work at Crucible priorities were required for the obtaining of scarce materials. Scarce materials were used by the Hunzinger Construction Company and by Grunau at petitioner's stables and polo club. In order to obtain these materials, priority purchase orders were issued by Crucible especially for this purpose and were signed by petitioner or his private secretary. *139 Petitioner had some of his polo ponies located near Manitowish, Wisconsin, in the northern part of the state. He frequently visited that locality and stayed at the Little Bohemia Lodge, which was owned by Emil Wanatka. On most occasions he went alone. Little Bohemia Lodge is a summer resort operated from the middle of May until September and eight or nine days in November during the deer-hunting season. When petitioner visited the lodge he frequently borrowed substantial sums of money, $100, $200, or more at a time, from Wanatka. Crucible paid petitioner's bills at the lodge, including the amounts he had borrowed from Wanatka, and charged the payments to corporate expense. While petitioner was at the lodge he would obtain some of the stationery there and write out invoices to Crucible indicating that customers of the corporation had been entertained there. These were presented to the corporation which then issued its checks. No mention was made of the moneys he had borrowed from Wanatka, except one item of "Cash $200" for September 4, 1943, but the invoice was paid by Crucible. Petitioner also entertained men with whom Crucible had business at the Lodge in 1942 and 1943. Of the *140 payments made by Crucible for petitioner's charges at Little Bohemia, by which respondent has increased petitioner's income for 1942 and 1943, one-fifth was spent for entertainment of customers and not for petitioner's personal account. Other personal bills of petitioner were paid by Crucible during 1941, 1942, and 1943, which were charged on the corporation's books as business expense, and carried to profit and loss. Included in the increase of petitioner's gross income for the periods involved are certain items which were not properly attributable to petitioner. They are as follows: 1941
Date
Amount
Payee
5/23/41
$29.20
Garret Stell
1942
10/31/42
62.16
Mason Lake Resort
1/15/42
46.50
A. Weiler Florist
2/26/42
1,115.00
Garret Stell
3/11/42
954.50
Garret Stell
4/23/42
64.92
United Air Lines
4/ 4/42
96.00
Barber Colman
6/18/42
14.40
Geo. J. Reith Window
Cleaning
7/13/42
20.90
Socony Vacuum
7/17/42
145.15
Arthur Kuesel Coal Co.
7/ 7/42
11.42
A. Weiler Florist
7/17/42
15.06
Duggers
7/29/42
12.50
Bunde & Upmeyer
8/ 6/42
116.82
Weber & Nettesheun
9/ 9/42
41.32
Socony Vacuum
10/ 9/42
71.15
E. H. Schaeffer Co.
12/ 8/42
118.80
Hotel Schroeder
12/29/42
25.00
Bunde & Upmeyer
1943
1/ 6/43
$ 23.63
Necedah Creamery
1/14/43
16.50
Bunde & Upmeyer Co.
3/ 2/43
50.00
A. L. Birch Co.
4/9/43
31.48
A. Weiler
5/25/43
18.67
A. Weiler Florist
5/20/43
20.00
Dr. Hugo Westhofen
6/17/43
482.00
Russell Weymeier
6/15/43
856.05
Russell Weymeier
6/10/43
286.80
Russell Weymeier
6/ 9/43
133.40
Tracy Kerr
6/ 7/43
140.50
Russel Weymer
10/18/43
106.52
Sears Roebuck
*141 Petitioner had no personal account as such on Crucible's books. However, there was an account entitled "Notes Payable, Officers" to which the various officers from time to time credited a part of their salaries and bonuses. Virtually no charges were made to this account, with the result that it contained substantial credit balances up to December 31, 1943. There was also another account entitled "Notes Receivable - Others," to which were charged a number of personal items of the various officers (but not those of petitioner mentioned above which were charged to expense accounts). There were comparatively few credits to this account, with the result that it had substantial debit balances. These accounts were not broken down to show the debit or credit balances of the individual officers. It was not until the revenue agent and special agent began their investigation that the corporation's accountant segregated the entries for the various individual officers. The practice of charging personal expenses of members of the Lange family to the corporation had existed as far back as 1934 or 1935. The corporate accounts reflecting such transactions were under the jurisdiction of the bookkeeper, *142 George Randall. During the periods involved Randall's duties were burdensome and required him to work several evenings during the week until about 10:00 o'clock. The corporation wrote letters around the end of 1943 to some personal creditors of the Lange family stating that it would no longer be responsible for their personal charges. On January 27, 1941, there were submitted two petty cash vouchers for the months of May and June, 1940, for $302.30 and $347.23, respectively, representing alleged travel and entertainment expense incurred by petitioner on behalf of Crucible. There were also submitted during that year three petty cash vouchers, each in the sum of $500, for alleged business expense of petitioner. These vouchers were in the handwriting of Walter, and these sums were paid to Walter and not to petitioner. For 1942 thirteen cash vouchers were submitted, and for 1943 the same number. These vouchers all bear the name of petitioner, and in all instances the petty cash was actually disbursed and the expenditures carried to Crucible's profit and loss account. Included in the amount by which respondent increased petitioner's gross income by reason of payment to him on petty *143 cash vouchers to Crucible are the following, for which petitioner did not receive any of the money indicated thereon. In some instances the vouchers were prepared by Walter or under his direction: March 11, 1942
$1,040.00
March 10, 1942
112.50
June, 1942
2,541.50
August, 1942
1,750.00
August, 1942
1,955.00
October, 1942
1,965.00
November, 1942
2,350.50
May 6, 1943
1,500.00
July 23, 1943
2,000.00
August, 1943
7,325.00
One petty cash voucher addressed to the company was on the letterhead of General Contractors, Inc., and dated July 9, 1943. It states merely "Excavating and trucking authorized by Mr. Scott - $791.00." This was an invoice for work done at petitioner's home at Thiensville and represented a purely personal expense. Included on the petty cash vouchers were numerous items among which were alleged cash expenses of petitioner for entertaining customers at Little Bohemia Lodge and at the Milwaukee Athletic Club. These purported expenses at Little Bohemia Lodge were in addition to the payments made by the Crucible checks referred to above. Petitioner spent only very nominal amounts of cash at the lodge. Some of the alleged expenditures were *144 for entertainment during the winter months when the lodge was not usually open. The alleged cash expenditures at the Milwaukee Athletic Club were for relatively large dinner parties and drinks, often in connection with bingo games held at the club. No dinners or drinks at bingo parties could be paid for in cash, but only by signing the check which would be charged to the member's account in accordance with the club rules. The dinner checks which petitioner did sign and the charges to his account at the club are smaller in amount and do not correspond with the amounts claimed on petitioner's petty cash vouchers. Such charges for business expenses as were made to petitioner's account at the club were paid by Crucible checks. These checks were charged to corporate expense on the company's books. The alleged cash expenditures at the club were not for business purposes. Among the alleged cash expenses shown on the petty cash vouchers bearing petitioner's name were substantial sums for trips to Mexico, California, and Alabama. There were also alleged expenses for rental of petitioner's airplane. Petitioner did not take these trips and did not use the airplane in Crucible's business. *145 Petitioner did travel for Crucible on occasion and in those instances submitted a list of expenses substantiated by railroad tickets and hotel bills. Such expenses have been allowed by respondent and are not in issue here. Walter also submitted false expense vouchers for employees who did not receive the amounts covered by the vouchers. Fraudulent expense vouchers were submitted in the names of 28 different employees. There was a bonus plan in operation at Crucible under which certain key men were supposed to share in the profits. They did not receive all of the bonus; part of it was placed in a strong box and used by Walter for purchasing scarce materials at prices in excess of ceiling. There were also suppressed sales, the proceeds of which were not included in Crucible's books. The proceeds of some of the irregularities were deposited to the account of Gulf Securities Holding Corporation and then split. A portion would be sent to Crucible for the things which did appear on the record and the other part would go to Walter. The checks were all made payable to him and cashed by him. Petitioner was not aware of this practice at the time it was going on. Walter told him about *146 it later. The moneys from suppressed sales and the bonus accounts did not go to petitioner directly. Petitioner received money from his own fraudulent petty cash transactions and payment of personal items by Crucible. On petitioner's original 1942 return he claimed a capital loss of $52,451 from the sale of 532 shares of the capital stock of the South Side Malleable Casting Company. This stock was claimed to have a basis of $53,200 and to have been sold for $749 on June 30, 1942. This claimed loss wiped out petitioner's reported gross income of $45,909, and no tax liability was reported on the return. When the return was audited by the collector's office, the latter called petitioner's attention to the fact that of the loss claimed, only $1,000 could be deducted. Accordingly, an amended return was filed in which the same loss was claimed but limited to $1,000. When petitioner filed his 1943 return he claimed a $1,000 capital loss carry-over from this same alleged transaction. The alleged stock sale was made to Elmer Hintz, and the latter was notified of the purported sale in a letter from the corporation's attorney, August Backus. This was the first knowledge Hintz had that his *147 name was being used in connection with the transaction. When asked for an explanation he was told by Walter Lange to forget about it. Hintz did not receive any stock or stock certificate, did not pay any money for any stock and did not at any time purchase any stock from petitioner. At the time of the purported sale and throughout the year 1942 petitioner owned 749 shares of the capital stock of the South Side Malleable Casting Company which were represented by certificate number 52 in his name. This certificate showed an endorsement to Elmer Hintz as of June 30, 1942, but the stub on the stock certificate book indicated no transfer in 1942. The stub for certificate number 52 showed that the 749 shares represented thereby were transferred on January 6, 1943, to the Gulf Securities Holding Company, of which petitioner, Walter Lange and members of the latter's immediate family were the sole stockholders. The 749 shares plus one other share represented by another certificate had a basis of $7,500. The South Side Malleable Casting Company had ceased operations about 1932 or 1933 and had been defunct since that time. During 1942 and 1943 petitioner employed servants at his home in Thiensville *148 and a stable man at the polo club. These employees were placed upon the payroll of Crucible at petitioner's direction and charged on its books to corporation wages. They performed no services for the company. The salaries for 1942 amounted to $950 and for 1943 to $2,115. In 1946 after a trial in the United States District Court at Milwaukee, petitioner was convicted of wilfully attempting to evade and defeat the income and excess-profits taxes of the Crucible Steel Casting Company for the years 1941, 1942, and 1943. His brothers, Walter Lange and A. C. Lange, and Crucible's bookkeeper, George Randall, were co-defendants and were also convicted. Petitioner was sentenced to serve a term of one year and pay a fine of $5,000. Substantial amounts of personal expenses of petition were paid by Crucible checks and charged to its operating accounts for the years 1941, 1942, and 1943. These amounts were not reported as petitioner's income although he knew about them. Substantial amounts of cash were received by petitioner from Crucible's petty cash for the years 1941, 1942, and 1943 which were used for personal purposes and not on behalf of the corporation. These amounts were not reported *149 as petitioner's income although he knew about them. Petitioner did not sell any shares of stock of South Side Malleable Casting Company in 1942, and the loss from that source claimed in his returns for 1942 and 1943 was not in fact sustained. Some part of the deficiency in tax for each of the years 1941, 1942, and 1943 was due to fraud with intent to evade tax. Opinion Petitioner has admitted that many of the items attributed to him by respondent and not reported are properly income to him. As to the contested items, the differences between the parties as to the correct amount of petitioner's gross income for the years in question are resolved in our findings. We have found that in some instances the income as determined by respondent was partly or altogether not properly attributable to petitioner. We have also allowed a portion of the expenses incurred by petitioner at the Little Bohemia resort, since it appears to us that to that extent the expenditure was a business expense of Crucible. With respect to the fraud, as our ultimate finding indicates, we are driven to conclude that respondent has sustained his burden of establishing that for each of the years some part of *150 the deficiency was due to fraud. While there is more than a suggestion that petitioner was unaware of many of the fraudulent operations of his brother, and may even have been victimized by them, nonetheless we are convinced that petitioner's own conduct, as disclosed by this record, justifies our conclusion with respect to fraud. Only his ignorance of all the transactions could exculpate him. See M. Rea Gano, 19 B.T.A. 518; Frank A. Weinstein, 33 B.T.A. 105. He made out his own tax returns, and to sustain his position that there was no fraud would require us to conclude that he was naive in a degree we are unable to believe. Decision will be entered under Rule 50.